UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BYRON HUBBARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-01229-JPH-MPB |
| | ) |
| WEXFORD OF INDIANA, LLC, et al. | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Byron Hubbard alleges that when he was incarcerated, the defendants failed to provide adequate medical care for his mental health, genital pain, and migraine headaches. Mr. Hubbard also claims that the defendants committed malpractice and subjected him to intentional infliction of emotional distress. The defendants moved for summary judgment, dkt. 197, 210, 222, and Mr. Hubbard has not responded.[1] For the reasons below, the motions are **GRANTED**.

**I. SUMMARY JUDGMENT STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

---

[1] Defendants' motion for summary judgment was filed on March 29, 2021. Mr. Hubbard requested and received multiple extensions of time to respond, and the Court notified him twice that no further extensions of time were anticipated. Dkts. 218, 226, 227 and 229. On the most recent deadline, September 7, 2021, Mr. Hubbard filed a motion stating that he could not respond to the motions for summary judgment. Dkt. 230. He contends, among other things, that "the confiscation and destruction of his legal work product has greatly contributed to him not filing an adequate response to any pending motion for summary judgment". *Id.* It appears from the docket that Mr. Hubbard has been released since early March 2021 and has had ample time to resolve any challenges that may have been created by having to litigate this case while incarcerated. Mr. Hubbard's most recent motion, dkt. 230, is **DENIED**.

1

317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. Deluga*, 555 F.3d 582, 584 (citation omitted).

The Court will recite the factual background for this case in accordance with the summary judgment standards. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to Mr. Hubbard as the nonmoving party. *See Barbera v. Pearson Education, Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). Further, because Mr. Hubbard has not responded to the summary judgment motions, the Court treats the defendants' supported factual assertions as uncontested. *See Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020); S.D. Ind. L.R. 56-1(b), (f).

## II. FACTS AND BACKGROUND

### A. The Parties

#### 1. Byron Hubbard

At all times relevant to the allegations in the complaint, Mr. Hubbard was committed to the custody of the Indiana Department of Correction ("IDOC") and incarcerated at New Castle Correctional Facility ("NCCF"). Mr. Hubbard suffered from several medical conditions during his time at NCCF, including mental health issues, genital pain, and migraine headaches. He was seen by and received care from mental health practitioners, doctors, a nurse practitioner, nurses, and nurse aids. He also interacted with non-medical staff who addressed his grievances and other

complaints about his care. In addition to his claims about the medical care he received, Mr. Hubbard alleges that his medications were mismanaged when he was transported from NCCF to county jail.

### 2. Mental Health Staff

Jennifer Harmon-Nary, PsyD, worked as a psychologist at NCCF. Dkt. 199-5 ¶ 2. Dr. Harmon-Nary cannot prescribe medication and instead focuses on psychotherapy and treating mental suffering in patients who need behavioral intervention. *Id.* ¶ 18. If inmates desire medication, they are scheduled to meet with an onsite psychiatrist. *Id.*

Penelope Wadleigh worked as a mental health nurse practitioner ("NP") at NCCF. Dkt. 199-6 ¶ 3.

Dr. Kristen Dauss worked as an independent contractor for Wexford of Indiana, LLC ("Wexford"), as the Regional Director of Psychiatry. Dkt. 224-2 ¶ 2. Dr. Dauss oversaw the provision of psychiatric services at all IDOC facilities. *Id.* ¶ 4.

### 3. Doctors

Doctors Bruce Ippel and Carl Kuenzli worked as doctors for Wexford. Dkt. 199-3 ¶ 2; dkt. 199-4 ¶ 5. Dr. Kuenzli was Wexford's Regional Medical Director and a physician at Miami Correctional Facility. Dkt. 199-4 ¶ 5, 8. While Dr. Kuenzli participated in a phone discussion about Mr. Hubbard's care, he never had any face-to-face contact with Mr. Hubbard. *Id.* ¶ 4, 8.

### 4. Nurse Practitioner

Jeffrey Glover worked as an NP at NCCF. Dkt. 199-11 ¶ 2. He performed assessments, identified and treated medical concerns, and provided health education. *Id.* ¶ 3.

### 5. Nurses

Lisa Blount, Alicia Coomer, Karen Decker, Jeffrey Robinson, and Heather Davis worked as registered nurses ("RN"s) at NCCF. Dkt. 199-7 ¶ 2; dkt. 199-8 ¶ 2; dkt. 199-9 ¶ 2; dkt. 199-15 ¶ 2; dkt. 199-18 ¶ 2. Nicole Clayborn, Jane Gregory, Lara McNew, and Gay Ann-Shenefield Mullins worked for Wexford as licensed practical nurses ("LPN"s) at NCCF. Dkt. 199-19 ¶ 2; dkt. 199-20 ¶ 2; dkt. 199-21 ¶ 2; dkt. 224-3 ¶ 1-2. Nurses do not have the authority to diagnose patients or order specific medical care. *See* dkt. 199-7 ¶ 4; dkt. 199-9 ¶ 5.

Nurse Blount does not recall having any face-to-face contact with Mr. Hubbard or providing medical treatment to him during the relevant time. Dkt. 199-7 ¶ 7. Her responsibilities include carrying out doctors' orders, dispensing medications, responding to healthcare request forms, and meeting with patients. *Id.* ¶ 3. Nurse Decker maintained the lists of inmates seen in the chronic care clinic. *Id.* ¶ 3. She also met with and triaged patients in nursing sick call after they submitted healthcare request forms. *Id.* While it is likely that she distributed medication to Mr. Hubbard, she does not recall any specific interactions with Mr. Hubbard related to medication. *Id.* ¶ 11.

### 6. Nurse Aids

Lorri Delk and Mandy Sue Prince worked as certified nurse aids ("CNA"s) at NCCF. Dkt. 199-10 ¶ 2; dkt. 199-13 ¶ 1-2. Their duties involved assisting nursing staff and providers. Dkt. 199-10 ¶ 3; dkt. 199-13 ¶ 4. They did not have the authority to diagnose patients or order specific medical care. Dkt. 199-10 ¶ 4; dkt. 199-13 ¶ 4. CNA Prince did not have any managerial authority over the distribution of medication to inmates. Dkt. 199-13 ¶ 4.

### 7. Review Officials

Kelly Durm worked for Wexford as the Health Services Administrator at NCCF. Dkt. 199-14 ¶ 1. She did not often provide direct patient care, but instead oversaw the provision of medical services. *Id.* ¶ 2. She did not have the authority to diagnose patients, order specific medical care, or override the medical judgment of the onsite providers. *Id.* ¶ 3.

Debra Ellington worked as the Director of Nursing at NCCF. Dkt. 199-16 ¶ 2. She oversaw nursing services and responded to healthcare requests or informal medical grievances. *Id.* ¶ 3. She did not have the authority to diagnose patients or order specific medical care or treatment. *Id.* ¶ 4.

Stacey Scott was the Associate Director of Administrative Services at NCCF. Dkt. 199-17 ¶ 2. Ms. Scott did not provide any direct medical care. *Id.* Instead, she responded to medical grievances and met with inmates to discuss their concerns about medical treatment. *Id.*

Nikki Tafoya was an IDOC employee who reviewed and responded to grievances. Dkt. 211-1 at 56 (Hubbard Dep. at 221:9-11).

### B. Mental Health Care

Mr. Hubbard met with Dr. Harmon-Nary and NP Wadleigh several times between 2017 and 2019 to discuss his mental health.[2] Mr. Hubbard refused to see Dr. Harmon-Nary several times.[3] Dr. Harmon-Nary never refused to see Mr. Hubbard, and when she did see him, she listened to his concerns and developed a treatment plan based on those concerns. Dkt. 199-5 ¶ 19.

---

[2] Dkt. 199-1 at 137-42 (March 15, 2017 – Mr. Hubbard placed on suicide watch based on his history of psychotic disorder and altered mental status); *id.* at 112-15 (June 22, 2017 – Upon evaluating Mr. Hubbard, NP Wadleigh did not believe he had any symptoms of a mental disability); *id.* at 52-56 (January 5, 2018 – Mr. Hubbard initially did not go to psychology appointment and went to the law library instead; when he arrived for the appointment he decided to be seen later because he did not want to see a female therapist); *id.* at 47-49 (April 13, 2018 – Mr. Hubbard discussed his frustrations with his medical care with Dr. Harmon-Nary); *id.* at 39-41 (June 1, 2018 – met for ongoing therapy and Mr. Hubbard did not report any immediate concerns).

[3] Dkt. 199-1 at 26-28, 18-19, and 5-10 (September 14, 2018, December 17, 2018, and March 12, 2019).

NP Wadleigh provided Mr. Hubbard with prescription medications that she was authorized to give him, and she did not falsify his records Dkt. 199-6 ¶ 8.

On November 14, 2017, Nurse Mullins updated Mr. Hubbard's chart to clarify the dosage of his Geodon prescription. Dkt. 224-1 at 9-10.

Mr. Hubbard saw Dr. Dauss on May 2, 2018, to discuss his mental health medication. Dkt. 224-1 at 2-5. Mr. Hubbard reported that he was not taking his medications because he had filed a lawsuit against prison officials. *Id.* Dr. Duass told Mr. Hubbard he needed to go to the med-line window to obtain his medications and encouraged him to do so. *Id.* Later that month, Dr. Dauss discontinued Mr. Hubbard's medications because he still did not take them. *Id.* at 1. Dr. Dauss saw Mr. Hubbard one other time to discuss grievances he had filed against NP Wadleigh. Dkt. 224-2 ¶ 11. She did not provide mental health treatment at that time but did work with staff to arrange the provision of his medications later in the day based on Mr. Hubbard's request. *Id.*

### C. Genital Pain, Migraines, and Chest Pain

In late May of 2017, Nurse Coomer saw Mr. Hubbard to renew his Prednisone prescription, and she received a verbal order from NP Glover to do so. Dkt. 199-1 at 122. Nurse McNew saw Mr. Hubbard in nursing sick call a few days later for his complaints of genital pain and asked that Dr. Ippel see him. Dkt. 199-1 at 119-21. NP Glover saw him about two weeks after that and ordered tests and prescribed an antibiotic. *Id.* at 116-17. On July 3, 2017, Nurse Robinson saw Mr. Hubbard and again referred him to a provider. *Id.* at 110-11. Dr. Ippel saw Mr. Hubbard a few days later and concluded that his headaches were likely stress-induced. *Id.* at 107-09. Mr. Hubbard had a prescription for Excedrin Migraine at that time. *Id.* Dr. Ippel adjusted Mr. Hubbard's medications based on Mr. Hubbard's report that Prednisone resolved his genital pain. *Id.*

6

The next week, Mr. Hubbard saw Nurse Issacs in nursing sick call after complaining of genital pain, and she referred him to a provider. *Id.* at 105-06. Mr. Hubbard later saw Dr. Ippel. *Id.* at 96-98. Mr. Hubbard's tests were normal, and he had stated that a daily low-dose of Prednisone had improved his symptoms. *Id.* Dr. Ippel told Mr. Hubbard to continue taking Prednisone and that he would request an ultrasound. *Id.* He also offered a Toradol injection for his pain, which Mr. Hubbard declined. *Id.* Dr. Ippel and Dr. Kuenzli discussed Mr. Hubbard's condition a few days later. Dkt. 199-4 ¶ 8. Dr. Ippel agreed to wean the Prednisone, use Mobic instead, and start Metoprolol as a migraine preventative. *Id.*

Nurse Durm saw Mr. Hubbard in nursing sick call a few days later, and he complained that his Excedrin Migraine had not been refilled for a few weeks. Dkt. 199-1 at 85-87. Nurse Durm referred Mr. Hubbard to the provider. *Id.*

Nurse Decker saw Mr. Hubbard in nursing sick call on August 11, 2017, where he complained of migraines, genital pain, and painful urination. *Id.* at 79-83. Nurse Decker tested his urine, which was normal. *Id.* Nurse Decker told him that she would need to speak with his physician to request renewing his medication. *Id.* On August 29, 2017, Dr. Ippel ordered Mr. Hubbard's Flomax to be restarted for his urinary issues. *Id.* at 75. Around September 11, 2017, Mr. Hubbard complained that his Excedrin Migraine had not been refilled. *Id.* at 70. Nurse Issacs noted that he had an active prescription and that she would email the pharmacy to reorder it. *Id.*

On September 17, 2017, Nurse Issacs met with Mr. Hubbard in nursing sick call after he reported that he had not urinated in nearly two days. Dkt. 199-1 at 67-68. Nurse Issacs offered to catheterize him and explained the procedure and the risks of not doing it, but Mr. Hubbard ultimately refused. *Id.* Mr. Hubbard was able to urinate before leaving sick call, and Nurse Issacs informed him that a sample would be sent out for urinalysis. *Id.*

7

Nurse Gregory saw Mr. Hubbard on October 5, 2017, when he complained of chest pain. *Id.* at 65-66. Mr. Hubbard's blood pressure was slightly elevated, and he seemed anxious about a medication issue. *Id.* Mr. Hubbard underwent an EKG to rule out any heart-related issues, and that test was normal. *Id.* Nurse Gregory provided Mr. Hubbard with his blood pressure and other medication, and he seemed more relaxed when he left the appointment because he had received his medications. *Id.*

Dr. Ippel saw Mr. Hubbard a few days later and Mr. Hubbard stated that the combination of Prednisone and Flomax essentially eliminated his symptoms. Dkt. 199-1 at 62-64. Dr. Ippel therefore requested Mr. Hubbard's Prednisone be re-authorized, and it was ordered that same day. *Id.*

Nurse Ellington saw Mr. Hubbard in nursing sick call on December 3, 2017, on his request for approval to take his meals back to his cell and a pass to use the restroom during recreation. Dkt. 199-1 at 60-61. Mr. Hubbard explained that he had trouble chewing his food when he had a migraine. *Id.* Nurse Ellington told Mr. Hubbard that medical providers do not normally write orders related to custody issues. *Id.* Nurse Isaacs saw Mr. Hubbard the next day where he again asked for a medical pass for his meals, and she also told him that medical staff could not issue passes for meals. *Id.* at 57-58.

On May 29, 2018, Dr. Ippel saw Mr. Hubbard for severe head pain, decreased hearing, blurry vision, and nausea that Mr. Hubbard said started after he was accosted at the county jail a few weeks earlier. *Id.* at 43-44. Dr. Ippel examined him and ordered Excedrin Migraine as needed and an x-ray of his spine and skull. Dkt. 199-1 at 42-44.

Dr. Ippel saw Mr. Hubbard again on August 27, 2018. *Id.* at 33-35. Dr. Ippel told Mr. Hubbard how to make an equivalent compound for Excedrin Migraine that Mr. Hubbard could

8

use as the Excedrin Migraine was not intended to be taken every day. *Id.* Mr. Hubbard had several active prescriptions at the end of the appointment, including Excedrin Migraine. *Id.*

On April 16, 2019, Mr. Hubbard was seen in nursing sick call complaining of severe chest pain. Dkt. 199-1 at 1-4. His blood pressure was 140/80 and his temperature was slightly elevated. *Id.* The nurse completed the emergency nursing chest pain protocol, and Mr. Hubbard was not observed to be in any acute distress. *Id.* Dr. Ippel ordered an EKG and advised Mr. Hubbard to apply heat to his chest for the pain. *Id.* Dr. Ippel did not believe Mr. Hubbard was having a heart attack and ordered Mr. Hubbard restart Metoprolol for chest pain and high blood pressure. *Id.* Mr. Hubbard was advised to submit another healthcare request form if his symptoms did not subside. *Id.*

### D. Mr. Hubbard's Healthcare Requests and Grievances

On August 2, 2017, Mr. Hubbard submitted a healthcare request form, marking the form as "urgent." *Id.* at 147. That form stated:

> This is a follow up. On 31 JUL 2017, Ms. Ketchum, the GEO Co had ordered me to leave the medical office after I had two call out passes, one for medical at 12:00 p.m. and for the library at 12:00 p.m. She told me that I was at the medical office too much causing trouble and filing grievances. I was there due to scrotum and shaft pain, painful urination and migraine headaches. My Excedrin migraine medicine needs refilled. Ms. Ketchem has intimidated me several times about coming to the medical office for treatment and filing grievances.

*Id.* Finding that Mr. Hubbard was not asking for specific medical care or attention, Ms. Davis responded that he did not include an issue appropriate for a nursing staff response. *Id.* She advised Mr. Hubbard to fill out the appropriate paperwork to address his issues. *Id.*; Dkt. 199-18 ¶ 8.

On August 27, 2017, Mr. Hubbard submitted a healthcare request form stating that he believed the nursing staff had retaliated against him because he filed so many healthcare requests. Dkt 199-1 at 156. Ms. Scott responded that providers had addressed all his concerns and his

9

prescription for Flomax was renewed. *Id.* She also advised him that the medical department was not "out to get anyone" but treated patients based on clinical guidelines. *Id.*

On September 14, 2017, Mr. Hubbard submitted a healthcare request form stating that he had been denied medical attention and that he had "lost confidence in the provider-patient relationship." *Id.* at 143. Nurse Davis responded that his submission was an inappropriate use of the healthcare request form as he was not asking for specific medical treatment. *Id.*; dkt. 199-18 ¶ 9. Also on September 14, 2017, Mr. Hubbard submitted a healthcare request form asking to see Dr. Ippel due to stress-related chest pains. Dkt. 199-1 at 152. Nurse Davis ensured that Mr. Hubbard was seen. *Id.*

From October 2017 through 2018, Ms. Scott responded to Mr. Hubbard's grievances. Dkt. 199-17 ¶¶ 9-16, 18-22. Ms. Scott also met with Mr. Hubbard several times to ensure he was aware of his medical treatment plan. She regularly investigated and responded to his grievances, by reviewing the medical records, speaking with medical staff, and advising Mr. Hubbard of the outcome. Dkt. 199-2 at 16-18, 24-25, 27-29, 31-32, 35-40.

Ms. Tafoya never failed to respond to Mr. Hubbard's grievances. Dkt. 211-1 at 58 (Hubbard Dep. at 228:10-15). Her responses often included notes stating who she spoke with regarding his grievance, which usually was the health care administrator. *Id.* at 59 (Hubbard Dep. at 232:2-6).

### E. Transport of Mr. Hubbard's Medication to Jail

Mr. Hubbard also alleges that his medications were mishandled when he was transported to county jails. Inmates transferred offsite are authorized to carry any medication that the inmate keeps with him ("KOP") and medical staff provides other medications for transport. Dkt. 199-17 ¶ 17. When Mr. Hubbard was transported to the Hamilton County Jail in 2018, medical staff made sure that his medications that were not KOP were transferred to the jail. Dkt. 199-2 at 21-23.

10

**F. Mr. Hubbard's Requests for Medical Records**

Mr. Hubbard requested to make copies of his medical records several times in the summer of 2017. Dkt. 199-1 at 147-49. CNA Delk informed Mr. Hubbard that he was scheduled to come to the medical unit on September 12, 2017, and Mr. Hubbard went to the unit that day, reviewed his records, and took notes from them. Dkt. 199-10 at ¶ 12.

### III. ANALYSIS

**A. Eighth Amendment Claims**

Mr. Hubbard brings Eighth Amendment claims against NP Wadleigh, Dr. Ippel, NP Glover, Nurse Isaacs, Nurse Gregory, Dr. Dauss, CNA Prince, Nurse Robinson, Nurse Coomer, Nurse Blount, Nurse Ellington, Nurse Decker, Nurse McNew, Nurse Clayborn, Nurse Mullins, Ms. Scott, Dr. Kuenzli, CNA Delk, Nurse Durm, Ms. Tafoya, Dr. Harmon-Nary, and Wexford.

To prevail on an Eighth Amendment deliberate indifference claim against a medical provider, Mr. Hubbard must demonstrate: (1) he suffered from an objectively serious medical condition; and (2) the medical defendants knew about his condition and the substantial risk of harm it posed, but disregarded that risk. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (cleaned up). "When a plaintiff's claim focuses on a medical professional's treatment decision, 'the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). "Disagreement between a

11

prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Norfleet*, 439 F.3d at 396.

Non-medical prison officials "may reasonably defer to the judgment of medical professionals regarding inmate treatment" unless the non-medical official has reason to believe that medical professionals are failing to treat or mistreating a patient. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019).

Here, it is undisputed that Mr. Hubbard was seen regularly for his mental health conditions and his complaints of genital pain, migraines, and chest pain. The designated evidence further shows that the health care providers who treated Mr. Hubbard regularly ran tests, prescribed medications, and changed medications. Dr. Ippel saw Mr. Hubbard regularly for his complaints and assessed his condition and adjusted his medications. *Id.* at 1–4, 33–35, 43–44, 62–64, 75, 96–98, 107–09. Nurses who saw Mr. Hubbard offered treatment and either referred him to a provider or received orders for medications or tests from the providers. *Id.* at 65-66, 67-68, 70, 79-83, 85-87, 105-06, 110-11, 119-122.

Some of the named defendants had very limited contact with Mr. Hubbard. Dr. Kuenzli's only involvement in Mr. Hubbard's care was to discuss his medications with Dr. Ippel. Dkt. 199-4 ¶ 8. Nurse Davis only reviewed Mr. Hubbard's health care requests and responded to them as she believed appropriate. *Id.* at 143, 147, 152. NP Glover saw Mr. Hubbard once for a complaint of genital pain and prescribed an antibiotic in response. Dkt. 199-1 at 116-17.

There is no designated evidence showing that any medical defendant mismanaged Mr. Hubbard's medication on his transport to jail or that CNA Delk disregarded his medical needs when she scheduled him to view his medical records. *See* Part II.E; II.F.

The designated evidence shows that Mr. Hubbard's medical providers considered his conditions and complaints and acted based on their medical judgment and authority. Mr. Hubbard did not respond to the summary judgment motion and has not designated evidence showing that any doctor, nurse, or nurse practitioner ignored his complaints or failed to exercise their judgment in treating him. *See Johnson*, 5 F.4th at 825. From the totality of the medical care that he received, no jury could find that the named medical provider defendants were deliberately indifferent. *See Petties*, 836 F.3d at 727-728.

The designated evidence further shows that the non-medical defendants–Ms. Scott and Ms. Tafoya–responded to all of Mr. Hubbard's requests and investigated them. *See* dkt. 199-2 at 16–18, 24–25, 27–29, 31–32, 35–40; dkt. 211-1 at 59 (Hubbard Dep. at 232:2-6). There is no evidence that they failed to investigate his medical grievances and requests or had any reason to believe that any of Mr. Hubbard's doctors or nurses were failing to treat him or mistreating him. *See Giles*, 914 F.3d at 1049.

Finally, although a private entity, Wexford acts under color of state law and therefore may be liable for damages under § 1983 only on "evidence that a Wexford policy, practice, or custom caused" the constitutional violation alleged. *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). But, because Mr. Hubbard has shown no violation of his Eighth Amendment rights, he has not shown that any policy, practice, or custom on Wexford's part resulted in the alleged violation of his rights. *First Midwest Bank Guardian of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (stating that a plaintiff "must establish that he suffered a deprivation of a federal right before [private entity] fault, deliberate indifference, and causation come into play").

All defendants are therefore entitled to summary judgment on Mr. Hubbard's Eighth Amendment claims.

### B. Retaliation Claims

"To prevail on a First Amendment retaliation claim, a plaintiff must establish three elements. First, he must show he engaged in protected First Amendment activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020).

While it is undisputed that Mr. Hubbard filed many grievances during the time relevant to his claims, he has not designated any evidence showing that any defendant took an adverse action against him because he filed grievances. As discussed above, the record shows that the medical defendants treated him in mental health appointments, nursing sick call, and provider appointments based on his complaints and their examination of him, not based on any retaliatory intent. *See generally* Part II. And there is no evidence that the defendants who reviewed or responded to his healthcare requests or grievances took an adverse action against him or based their responses on the fact that he had filed grievances. Mr. Hubbard therefore has failed to present evidence that any defendant retaliated against him, so the defendants are entitled to summary judgment on his retaliation claims.

### C. Equal Protection Claims

Mr. Hubbard brings Equal Protection claims against NP Wadleigh and Nurse Decker. To support an Equal Protection claim, Mr. Hubbard must provide evidence that: (1) he was a member of a protected class, (2) he was treated differently from a similarly situated member of an unprotected class, and (3) the defendants were motivated by a discriminatory purpose.

*Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017). Mr. Hubbard has not designated evidence showing that NP Wadleigh or Nurse Decker treated Mr. Hubbard differently than other patients based on his race. They are therefore entitled to summary judgment on his Equal Protection claim.

### D. Disability

Mr. Hubbard also alleged in his complaint that Wexford denied him services because of a disability. The Rehabilitation Act states that no qualified individual with a disability "shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To support his claim under the Rehabilitation Act, Mr. Hubbard must show: "'(1) he is a qualified person (2) with a disability and (3) Wexford denied him access to a program or activity because of his disability.'" *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (quoting *Jaros v. Ill. Dep't. of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)). As discussed above, Mr. Hubbard was provided extensive medical care. He has presented no evidence showing that Wexford denied him any access to its programming because of a disability. Wexford is therefore entitled to summary judgment on this claim.

### E. State Law Claims

Finally, Mr. Hubbard alleges state law claims of negligence, malpractice, and intentional infliction of emotional distress. The Court must determine whether it is appropriate to exercise supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367.

The Court has discretion to exercise supplemental jurisdiction over a plaintiff's state-law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider

and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

"[T]he usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)) (internal quotation marks omitted).

The relevant factors weigh in favor of following the "usual practice" in the Seventh Circuit and relinquishing supplemental jurisdiction. *Groce*, 193 F.3d at 501. The Court has not expended significant resources on the pending state-law claims. To the extent the parties have during discovery, those efforts can be duplicated in state court with relative ease. And, while the defendants have briefed summary judgment on those claims, Mr. Hubbard has not. Relatedly, the Court decided the Eighth Amendment claim on the deliberate-indifference element, which is not at issue in the negligence claims. Finally, as always, comity favors allowing state courts to decide issues of state law.

Moreover, none of the exceptions to the usual practice of relinquishing supplemental jurisdiction apply here. The statute of limitations will not have run on Mr. Hubbard's state-law claims, as both federal and state law toll the relevant limitations period when claims are pending

16

in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). Substantial resources have not been expended on these claims, especially any that cannot simply be re-used in state court. Nor is it absolutely clear how the claims should be decided, given that Mr. Hubbard did not address those claims.

For these reasons, the Court exercises its discretion to relinquish supplemental jurisdiction over the remaining state-law claims.

### IV. Conclusion

The defendants' motions for summary judgment, dkt. [197], dkt. [210], dkt. [222], are **GRANTED.** Mr. Hubbard's motion for court assistance, dkt. [230], is **DENIED**. Final judgment consistent with this Order, the Screening Order of January 29, 2020, dkt. 83, and the stipulation of dismissal, dkt. 185, shall now issue.

**SO ORDERED.**

Date: 9/24/2021

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

BYRON HUBBARD

All Electronically Registered Counsel